J-A16022-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PHILIP SIVERD, O/B/O P.S., B.S., AND A.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MELISSA SIVERD | : | |
| | : | No. 202 WDA 2026 |
| Appellant | : | |

Appeal from the Order Entered January 5, 2026
In the Court of Common Pleas of Crawford County Civil Division at No(s):
AD 2025-871

BEFORE:  McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED: July 21, 2026**

Appellant, Melissa Siverd ("Mother"), appeals from the order entered in the Crawford County Court of Common Pleas, under the Protection From Abuse Act ("PFA"),[1] in favor of Father, Philip Siverd ("Father"), on behalf of two of his minor children, P.S. (born October 2012) and B.S. (born August 2014), and granting Father temporary custody of all minor children, including A.S. (born May 2018).  We affirm.

The relevant facts and procedural history of this appeal are as follows. Mother and Father are the natural parents of the three minor children.  They were previously married, but divorced in 2019, and live separately.[2]  Prior to November 2025, Father had primary physical custody of the children.  Mother

---

[1] 23 Pa.C.S.A. §§ 6101-6122.

[2] There are pending custody proceedings in Erie County.

had partial physical custody of the children every other weekend, and every Wednesday and Thursday for approximately four hours.

On November 19, 2025, an incident occurred where P.S. told her younger siblings to shut up and enraged Mother, who demanded that P.S. give her P.S.'s iPad. When P.S. refused, because the iPad was her only way to contact her father, Mother attempted to physically wrestle the iPad away from her. During the struggle they fell on the floor, with Mother on top of P.S. Eventually, Mother was able to retrieve the iPad by pinning P.S.'s left arm behind her back. Mother then went and hid the iPad in her bedroom, explaining to P.S. that she was taking the iPad as a disciplinary action.

P.S. attempted to retrieve her old cell phone, and Mother attempted to confiscate the phone as P.S. attempted to go upstairs. Mother then grabbed P.S. by her hoodie, pulling out some of P.S.'s hair in the process. P.S. threatened to go to their neighbors' house, and Mother called the police. Once officers arrived, they found P.S. sitting calmly on the couch. After P.S. spoke with officers she went to her room and stayed there until Father arrived.

On November 20, 2025, Father filed a PFA petition against Mother on behalf of the children and the court granted a temporary PFA. On January 5, 2026, the court conducted a PFA hearing. At that time, both parties appeared with counsel. P.S. and B.S. testified *in camera* and on record with both parents' counsel present and able to conduct direct and cross examination. By stipulation, any allegations of abuse against A.S. were withdrawn from the petition.

At the hearing, P.S. testified to the events of November 19, 2025, and stated that on many other occasions Mother becomes physically aggressive with her, slaps her across the face, and pushes her. P.S. testified that Mother slaps all the children across the face, pulls out their hair, and hits them with a wooden spoon and belts. P.S. also stated that Mother threatened to have her sent to Bethesda, a facility for delinquents.

P.S. testified that she is afraid of Mother and has received bruises and scratches in these altercations. P.S. described Mother as having split personalities. P.S. stated that she loves Mother and as a result waited too long to disclose the physical abuse to Father. P.S. testified that she informed Father about Mother's conduct after the November 19th incident. P.S. further testified that Mother stated that if P.S. told the police officers "any mental stuff" she would "slap her across the face." (*See* N.T. Hearing, 1/5/26, at 30).

B.S. testified at the hearing regarding an incident on October 23, 2025. At that time, B.S. was at Father's house preparing to go to hockey practice. There was some sort of dispute about which parent was going to take B.S. to practice, as Mother took B.S.'s bag from him and put it in her car. B.S. removed the bag and went to put it in Father's car instead. Mother then removed the bag from Father's car, and a tugging match ensued. While Mother tried to get the bag off of B.S.'s shoulder, B.S.'s leg struck the metal hitch on the back of Father's car, and his head was pushed into the trunk. Mother then drove B.S. to Meadville, where a carpool could take him to

practice.

B.S testified that Mother frequently hit him when she felt that he was disrespectful of his siblings. B.S. described an incident where Mother woke him up one morning by slapping him repeatedly. B.S. stated that he is afraid of Mother and does not feel that her striking him in the face, butt, legs, and back is appropriate.

Mother testified regarding the November 19, 2025 incident. According to Mother, P.S. was being disrespectful to her siblings and to Mother when Mother attempted to take the iPad away. Nevertheless, Mother did admit to the key physical details of the altercation, including trying to physically pull the iPad away from P.S., grabbing P.S. by the hoodie and accidentally pulling out some of her hair, and pinning down P.S.'s arm. Mother also claimed that P.S. had followed her around and attempted to push and strike her. Mother denied that P.S. had fallen or that Mother had fallen on top of her.

Regarding the October 23, 2025, incident, Mother claimed that B.S. was confused about who was driving him to hockey practice, and that despite his belief, she was supposed to drive him. According to Mother, B.S. almost knocked her over while he pulled and tugged at the hockey bag. Mother claimed that B.S. was cursing at her, including saying "f you" and calling her stupid, and attempting to record her with his phone during the ensuing argument. (*See* N.T. Hearing, 1/5/26, at 70). Mother admitted that B.S. hit his shin on the car hitch when she attempted to take the hockey bag away from him. However, she denied pushing B.S. into the cargo compartment of

the car and did not recall B.S. hitting his head or face. Mother also denied slapping B.S. to wake him up and claimed that she was merely "tapping his shoulders." (*See id.* at 72).

Mother admitted to using corporal punishment to discipline the children. However, she described the punishment as "spanking" or "tapping them on the thigh just to get their attention." (*Id.* at 76). Mother denied pulling out P.S.'s hair on purpose. Further, although she initially denied slapping the children in the face, Mother later admitted on cross examination that she "tapped them in the mouth." (*Id.* at 84). Mother also admitted to hitting B.S. with a belt and clarified that "it happened to be a smaller belt and it did leave a mark on his leg." (*Id.*). Mother denied having an anger problem; rather, Mother stated that she was "reactive like every other parent is reactive at times." (*Id.* at 85).

That same day, the court entered a final PFA order against Mother. The order remains in effect until January 5, 2027, and directs Mother not to abuse, stalk, harass, threaten, or attempt to threaten or to use physical force against P.S. and B.S. Further, the order granted Father temporary custody of all three minor children, and directed that Mother shall have no partial physical custody or visitation rights, or any contact, except that Mother may be in the presence of the minor children for purposes of engaging in appropriate family counseling, with the possibility of modification of the order in conjunction with successful counseling sessions. On January 6, 2026, the court issued findings of fact and conclusions of law supporting its decision.

On January 15, 2026, Mother filed a motion for reconsideration. Therein, Mother requested that the court reconsider the entry of the final PFA, arguing that the minor children's testimony was incredible and contradictory, and that while she was appreciative of the counseling opportunity provided, Mother feared that she would lose her nursing license and job as a result of the entry of the order.

On January 28, 2026, the court held a hearing on the motion for reconsideration but denied the motion that same day.[3] As well, the order indicated that the court denied Mother's oral motion to extend the appeal period. On February 4, 2026, Mother timely filed a notice of appeal and contemporaneous statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). In lieu of a Pa.R.A.P. 1925(a) opinion, the court noted that its reasoning supporting the entry of the order was contained within the findings of fact and conclusions of law entered on January 6, 2026.

On appeal, Mother raises the following issues for our review:

> A. Whether the Trial Court abused its discretion and erred as a matter of law, by proceeding with the January 5, 2026 Final Protection from Abuse Hearing before receiving the results of the Crawford Court Children and Youth Services investigation.
>
> B. The Trial Court abused its discretion and erred as a matter of law, by not considering the Crawford County

---

[3] The transcript from the hearing on the motion for reconsideration does not appear in the certified record on appeal; Mother's request for transcripts attached to her notice of appeal requests "the entire proceeding" but does not specify dates, nor did Mother check a box indicating she wished to have post-trial proceedings transcribed. (**See** Request for Transcripts, 2/18/26).

Children and Youth Services investigation and ultimate finding of an unfounded [ChildLine report].

C. Whether the Trial Court abused its discretion and erred as a matter of law, by only considering the minor children's *in camera* testimony and not the interviews given to Crawford County Children and Youth Services investigator.

D. Whether the Trial Court abused its discretion and erred as a matter of law, in awarding [Father] temporary custody of minor child A.S. despite A.S. not being a protected person under the January 5, 2026 Final Protection from Abuse Order.

E. Whether the Trial Court abused its discretion and erred as a matter of law, in concluding that Mother abused the minor children within the meaning of the Protection from Abuse Act.

(Mother's Brief at 4-5).

When reviewing an appeal from the issuance of a PFA order, we examine "the trial court's legal conclusions for an error of law or an abuse of discretion. The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." **K.B. v. Tinsley**, 208 A.3d 123, 127 (Pa.Super. 2019) (citations omitted). "An abuse of discretion is not merely an error of judgment," rather a court abuses its discretion when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record[.]" **Walker v. Walker**, 321 A.3d 1060, 1063 (Pa.Super. 2024) (citation omitted).

In Mother's first three issues combined,[4] she asserts that the trial court erred by proceeding with the final PFA hearing before receiving the results of the Crawford County Children and Youth Services ("CYS") investigation regarding the allegations of child abuse regarding P.S. Mother asserts that the investigation ultimately resulted in an unfounded ChildLine finding. Mother contends that the court made its decision solely on the basis of the *in camera* testimony of P.S. and B.S., which she asserts was contradictory and unreliable. With the benefit of the unfounded ChildLine report, Mother asserts that the court would have been compelled to reach a different conclusion at the PFA hearing. We disagree.

Preliminarily, we must determine whether Mother has preserved this issue for our review:

> The fundamental tool for appellate review is the official record of what happened at trial, and appellate courts are limited to considering only those facts that have been duly certified in the record on appeal. To ensure that the appellate courts have all necessary records, the Pennsylvania Rules of Appellate Procedure provide for the transmission of certified records from trial courts to appellate courts.

> \* \* \*

> [Pa.R.A.P. 1911] makes it clear that appellants must order all transcripts necessary to decide the appeal, and that the Superior Court may take any action it deems appropriate, including dismissal of the appeal, if the appellant does not order the necessary transcripts.

---

[4] We will address Mother's first three issues together as they are interrelated and Mother groups them together in her brief.

*Commonwealth v. Gillen*, 798 A.2d 225, 229 (Pa.Super. 2002) (quoting *Commonwealth v. Williams*, 552 Pa. 451, 456-57, 715 A.2d 1101, 1103-04 (1998)). It is the **appellant's** responsibility to order all transcripts necessary for appellate review. *Commonwealth v. Steward*, 775 A.2d 819, 833-34 (Pa.Super. 2001). Further, "it is unreasonable to expect the court reporter to transcribe all of the proceedings simply because the appellant asks the court reporter to 'produce, certify, and file transcript in the matter....'" *Gillen, supra* at 229 n.4. Further, issues not raised in the trial court are waived and cannot be raised for the first time on appeal. *See E.K. v. J.R.A.*, 237 A.3d 509, 522 (Pa.Super. 2020) (finding evidentiary issue waived for failure to lodge timely and specific objection at PFA hearing). *See also* Pa.R.A.P. 302(a).

Instantly, the record shows that Mother did not request a continuance at any time during the PFA hearing pending the results of the CYS investigation. Additionally, Mother's written motion for reconsideration also did not assert that the court should have continued the PFA hearing pending the results of the CYS investigation, nor does it mention that the ChildLine report was considered unfounded. Further, Mother fails to articulate in her brief on appeal where in the record she requested a continuance or otherwise attempted to preserve this issue for appeal.

We note that the record includes a packet of exhibits from the reconsideration hearing, including two notices from CYS. One notice, mailed December 29, 2025, indicated that the ChildLine report was determined to be

unfounded. (*See* Hearing Exhibits, 1/28/26, Ex. 2). The second notice, dated January 9, 2026, indicated that the family had not been accepted for ongoing services. (*See* Hearing Exhibits, 1/28/26, Ex. 1). The trial court's order denying Mother's request for reconsideration mentions that Mother requested an extension of time to appeal, but such a request does not appear in the written motion for reconsideration, and the order does not indicate why Mother made such a request. (*See* Order, 1/28/26).

In the absence of the transcript from this hearing, we cannot determine in what manner these exhibits were used or what arguments Mother made at the reconsideration hearing. Because Mother's request for the transcripts failed to specify which notes of testimony she wished transcribed or in any other manner identify the reconsideration transcript, her request was insufficient to notify the stenographer that she wished to have the reconsideration hearing transcribed and transmitted to this Court. *See Gillen, supra*. Further, we cannot discern why Mother failed to mention the ChildLine investigation in her motion for reconsideration, as the decision was mailed two weeks prior to the filing of the motion. On the record before us, we must conclude that Mother's first three issues are waived on appeal for failure to preserve them for our review. *See E.K., supra*; *Gillen, supra*. *See also* Pa.R.A.P. 302(a); 1911.

In Mother's fourth issue on appeal, she argues that the trial court erred in awarding Father temporary custody of A.S. Mother asserts that A.S. was not a protected person under the January 5, 2026 final PFA order. Further,

Mother emphasizes that the parties had stipulated to withdraw abuse allegations as to A.S. Mother concludes the court should not have awarded Father temporary custody of A.S. under these circumstances. We disagree.

Here, the parties agreed at the PFA hearing that any allegations of abuse as to A.S. should be withdrawn from the petition. The parties then discussed the PFA petition and temporary custody as follows:

> **[FATHER'S COUNSEL]**: It is my understanding, however, that if the [c]ourt finds that grounds for a PFA do exist in regard to the two older children, [P.S and B.S.], **that [Mother] will acquiesce and not force [A.S.] to follow the current custody order that is in effect from Erie County until further proceedings are held in Erie on all of the custody issues**.
>
> I will note for the [c]ourt that there is a custody modification petition pending in Erie County. We are awaiting the assignment of the time and date for our first proceeding which is a conciliation in Erie County pending the outcome of this case.

(N.T. Hearing, 1/5/26, at 4-5) (emphasis added). After the parties were sworn in, Father's counsel further stated:

> **[FATHER'S COUNSEL]**: Thank you. [Father,] you've heard the information I presented to the Judge, is that your—do you agree to the terms so that this matter may proceed?
>
> **[FATHER]**: Yes.
>
> **[THE COURT]**: All right. [Mother's counsel]?
>
> **[MOTHER'S COUNSEL]**: Sure. [Mother,] you had a chance to hear [Father's counsel] read into the record the stipulation, do you agree to the [terms] that were read into the record here?

- 11 -

**[MOTHER]**: Yes.

(N.T. Hearing, 1/5/26, at 5-6).

Our review of the record indicates that Mother agreed that if grounds for a PFA existed as to the two older children, Mother would "acquiesce and not force [A.S.] to follow the current custody order that is in effect from Erie County until further proceedings are held in Erie on all of the custody issues." (N.T. Hearing, 1/5/26, at 4-5). Specifically, when asked whether she agreed to the terms read into the record, Mother stated, "Yes." (N.T. Hearing, 1/5/26, at 5-6). Given Mother's stipulation, she is not entitled to relief on this issue on appeal. *See Tyler v. King*, 496 A.2d 16 (Pa.Super. 1985) (explaining that parties may bind themselves on matters relating to individual rights and obligations, so long as their stipulations do not affect court's jurisdiction or due order of business; court will hold party bound to her stipulation; concessions made in stipulations are judicial admissions and may not later in proceeding be contradicted by party who made them).

In Mother's final issue, she contends that the court erred in concluding that she had abused the children within the meaning of "abuse" in the PFA. According to Mother, the trial court relied upon "inconsistent, unreliable, and varying testimony" from the children, and that no other evidence was offered to substantiate their claims.[5] (Mother's Brief at 11-12). Mother admits that

_____

[5] Initially, we note that Mother incorrectly conflates arguments regarding the weight and sufficiency of the evidence. Specifically, her contentions that the children's testimony was contradictory and unreliable is more appropriately a

*(Footnote Continued Next Page)*

she employed corporal punishment discipline, but she contends that this is not abuse as defined under the PFA Act. Mother suggests that in the interest of public policy, this Court should not determine how a parent should discipline a child. Mother claims that the extent of the corporal punishment she used was "spankings, at times with a belt, or a tap on the mouth." (Mother's Brief at 27). Mother concludes the evidence was insufficient to satisfy the definition of abuse under the PFA Act, and this Court must grant relief. We disagree.

When examining a challenge to the sufficiency of the evidence supporting a PFA order, our standard of review is as follows:

> When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting [him] the benefit of all reasonable inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

*S.G. v. R.G.*, 233 A.3d 903, 909 (Pa.Super. 2020) (quoting *Fonner v. Fonner*, 731 A.2d 160, 161 (Pa.Super. 1999)).

---

challenge to the weight of the evidence and not the sufficiency of the evidence. *See Commonwealth v. Antidormi*, 84 A.3d 736 (Pa.Super. 2014) (setting forth distinct standards of review for weight and sufficiency of evidence claims). In any event, assuming, *arguendo*, that Mother adequately raised a weight claim, we note the trial court repeatedly explained in its findings of fact and conclusions of law that, having viewed the testimony and evidence at the hearing, it found the testimony of P.S. and B.S. credible and, by implication, found the testimony of Mother incredible. (*See* Findings of Fact and Conclusions of Law, 1/6/26, at 1-3). This Court "defers to the credibility determinations of the trial court as to witnesses who appeared before it." *K.B., supra* at 128.

The PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence. A preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, enough to tip a scale slightly.

*Bhatia v. Fernandez*, 319 A.3d 517, 520 (Pa.Super. 2024) (citation omitted).

The PFA Act defines abuse as follows:

### § 6102. Definitions

**(a) General rule.—**The following words and phrases when used in this chapter shall have the meanings given to them in this section unless the context clearly indicates otherwise:

**"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

\* \* \*

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102(a)(2).

In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of bodily injury. [*See Raker v. Raker*, 847 A.2d 720, 725 (Pa.Super. 2004)]. "The intent of the alleged abuser is of no moment." [*Buchhalter v. Buchhalter*, 959 A.2d 1260,

1263 (Pa.Super. 2008)]. Moreover, this Court has held that past acts are significant in determining the reasonableness of a PFA petitioner's fear. *Id.* at 1264. As the goal of the Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the Act to apply.

*K.B., supra* at 128.

The Act does not prohibit parents from administering corporal punishment to discipline their children. *See, e.g., Chronister ex rel. Morrison v. Brenneman*, 742 A.2d 190, 193 (Pa.Super. 1999). Nevertheless, corporal punishments administered in anger, that result in bodily injury, may indeed warrant a PFA. *Miller on behalf of Walker v. Walker,* 665 A.2d 1252, 1254 (Pa.Super. 1995).

In *Miller*, this Court upheld a PFA order where the child testified that his father had struck him with a board on the leg, that he experienced pain and developed a bruise, and also experienced a bruise from his father gripping his arm. *See Miller, supra* at 1256. Further, the mother testified that the father had a history of difficulty in controlling his temper and that she had observed bruising of her children on prior occasions. *See id.* Ultimately, this Court concluded that "[t]he Protection from Abuse Act does not outlaw corporal punishment by a parent. However, the Act will permit a remedy for bodily injury to a family or household member which is inflicted intentionally, knowingly, or recklessly." *Id.* at 1258. In that case, the pain and bruising constituted bodily injury as that term is used in the Act's definition of abuse. *See id.* at 1256-58.

Here, the court concluded:

Based upon the foregoing findings of fact, the [c]ourt finds by a preponderance of the evidence that [Mother] has knowingly engaged in a course of conduct and repeatedly committed acts towards P.S. and B.S. under circumstances which placed both of the children in reasonable fear of bodily injury; therefore, the [c]ourt finds that [Mother] has abused the two minor children within the meaning of the [PFA] Act.

(*See* Findings of Fact and Conclusions of Law, 1/6/26, at 2).

The record supports this conclusion. P.S. testified that Mother ripped out her hair, that she has received bruises and scratches in altercations with Mother, that Mother regularly spanks her, hits her with belts and spoons, and that she is afraid of Mother hurting her. Similarly, B.S. testified that Mother regularly has slapped him, including in the face, spanked him, and hit him with a belt so hard that it left a bruise for a month, and that he is afraid of Mother hurting him. Both children described Mother's anger as escalating. The court found this testimony credible.

Further, Mother admitted to using physical force to discipline the children, including hitting them in the face and hitting B.S. with a belt such that a mark was left on his body. Despite Mother's admissions, she attempted to downplay or minimize her own actions, describing the physical contact as "taps" or stating that the belt was "a small one" or her anger as being "reactive like any other parent is reactive." (*See* N.T. Hearing, 1/5/26, at 84). Based on the court's entry of the PFA order, the court rejected this testimony in favor of the testimony of P.S. and B.S.

Viewed in the light most favorable to Father as petitioner, we agree with

the court that the evidence was sufficient to support the court's entry of the PFA order. ***See S.G., supra***. The preponderance of the evidence showed that Mother engaged in a course of conduct which placed P.S. and B.S. in reasonable fear of bodily injury, such that the entry of a PFA was warranted against Mother. ***See K.B., supra***. ***See also Bhatia, supra***. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

7/21/2026